**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

EDGAR ALBERTO AYALA, a/k/a Pony,

*Defendant-Appellant.*

No. 07-4577

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

OSCAR RAMOS VELASQUEZ, a/k/a Casper,

*Defendant-Appellant.*

No. 07-4755

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(8:05-cr-00393-DKC-4; 8:05-cr-00393-DKC-18)

Argued: January 29, 2010

Decided: April 8, 2010

Before WILKINSON and AGEE, Circuit Judges, and R.
Bryan HARWELL, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Harwell joined.

## COUNSEL

**ARGUED**: Gary Allen Ticknor, Elkridge, Maryland, for Appellants. Sandra Wilkinson, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Richard C. Bittner, Glen Burnie, Maryland, for Appellant Oscar Ramos Velasquez. Rod J. Rosenstein, United States Attorney, James M. Trusty, Assistant United States Attorney, Laura Gwinn, Trial Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

## OPINION

WILKINSON, Circuit Judge:

This case concerns the prosecution of members of the violent street gang La Mara Salvatrucha under various statutes, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, and the Violent Crimes in Aid of Racketeering ("VICAR") statute, 18 U.S.C. § 1959. On appeal, the defendants raise numerous claims, some individually and others collectively. After careful consideration, we reject the defendants' various claims, affirm the judgment of the district court, and commend that court for its conscientious conduct of this six-week trial.

### I.

### A.

La Mara Salvatrucha, otherwise known as MS-13, is one of the largest and most violent street gangs in the United States.

The gang originated in Los Angeles, California in the 1980s. Since then, it has spread across the country and into foreign countries such as El Salvador, Honduras, and Mexico. Today, it has a large presence in the eastern United States, including parts of Maryland and Virginia.

Violence defines MS-13's mission. The gang initiates its members through violence: existing members beat up the new members for a period of thirteen seconds. This ritual is meant to signify the beginning of a new, more brutal lifestyle. Once initiated, MS-13 members commit violent acts to defend the gang's territory against its rivals and to spread fear so that citizens do not report the gang's activities to the police. In fact, gang members are required to attack and, if possible, kill rival gang members whenever they see them. MS-13 members gain status within the gang through their willingness and ability to commit such violent acts.

The gang maintains internal discipline through the use of violence as well. Members who do not follow the rules are routinely beaten, and those who cooperate with the police face penalty of death. The violent nature of MS-13 is captured by one of its mottos: "mata, viola, controla" which means "kill, rape, control."

MS-13 is organized into local cliques. Each clique has two leaders: a "first word" and a "second word." The first word is responsible for running the clique's meetings, and the second word does so in his absence. At clique meetings, MS-13 members report on their violent activities which often include murders and robberies. The gang also discusses ongoing police investigations and devises ways to prevent others from cooperating with the police. In addition, members pay dues at meetings, which the clique uses to buy weapons, make loans to members, and support members who are in jail.

Leaders of the various cliques frequently communicate and coordinate with one another to achieve the gang's objectives.

They provide each other with material support, often in the form of guns or places to hide from the police.

## B.

This case primarily involves two MS-13 cliques that operate in Prince George's County and Montgomery County, Maryland: the Sailors Locos Salvatruchos Westside ("Sailors") and the Teclas Locos Salvatruchos ("Teclas"). A taskforce composed of federal and state agents conducted an extensive investigation into the activities of these cliques. The investigation was aided substantially by an informant within the ranks of the Sailors clique known as Noe Cruz. Cruz regularly provided the police with information about the gang's violent activities from December 2003 until August 2005. At that point, the police executed numerous search warrants and arrested many suspected gang members.

Among those arrested were the defendants here, Edgar Alberto Ayala and Oscar Ramos Velasquez. The facts relevant to their involvement in MS-13 are as follows.

## 1.

At some point prior to February 2002, Ayala became a member of the Sailors clique of MS-13. Ayala attended meetings, paid dues, and even collected dues on behalf of the clique. He eventually became a leader in the clique, obtaining the rank of second word. During his time in MS-13, Ayala knew about or participated in several of the clique's violent activities.

One of these was the murder of Randy Calderon who was a member of the Sailors clique. In the early morning hours of November 22, 2003, Calderon and another MS-13 member stabbed a rival gang member to death, wrapped his body in bed sheets, and tossed it in a dumpster. They did so at the apartment of fellow gang member Juan Moriera, without first

obtaining Moriera's permission. Concerned that Calderon would confess the murder to the police and implicate him in the crime, Moriera shot and killed Calderon that same morning with the help of other MS-13 members.

Ayala was well aware of the circumstances surrounding Calderon's death. Shortly after the murder, Ayala told a fellow gang member that it was necessary to kill Calderon to keep him from confessing the murder to the police. Ayala also attended a clique meeting where the murder was discussed. Moriera explained the details of the murder to the clique. Then Moriera and the clique's first word, Israel Cruz, announced a new rule: anyone who did not do as they were supposed to do would face the same fate as Calderon did.

Ayala was also aware of a murder that took place in Suitland, Maryland. On May 21, 2004, three MS-13 members, including Ayala's brother Alexis, beat a rival gang member to death and left his body at a cemetery. At a Sailors meeting soon thereafter, Alexis described the murder in detail. Ayala and Israel Cruz then advised Alexis to leave town to avoid the police. Ayala later attempted to cover up this murder by telling a Maryland grand jury that he had not spoken about it with his brother.

Ayala participated in a gang-related shooting at an apartment complex in Alexandria, Virginia. On January 21, 2005, a group of Sailors, including Ayala, Noe Cruz, and Moriera, drove from Maryland to Virginia to look for rival gang members. As they drove by an apartment complex, they spotted some adolescents socializing on a stoop. Moriera suspected that these teenagers were members of a rival gang. The group then drove to a convenience store, where they met up with another MS-13 member who brought two handguns. Shortly thereafter, four MS-13 members, including Ayala, drove off in Ayala's vehicle to find the teenagers they had spotted earlier.

According to the teenagers, two men approached them, and one opened fire with a pistol. The teenagers attempted to flee into the apartment building, but three of them were caught in the line of fire. A fifteen-year-old boy died in the attack, and two other teenagers were injured. One girl at the scene later identified Moriera as the shooter. Although no eyewitnesses reported seeing a second gun, police found bullets from two different guns at the scene.

Lastly, Ayala and other MS-13 members attempted to commit a murder in the Baltimore, Maryland area. On February 23, 2005, Ayala, Israel Cruz, and Noe Cruz drove to Baltimore, met up with MS-13 members from another clique, and went to the home of an individual with whom the gang had a dispute. Their plan was that one MS-13 member would lure the individual from his home, while Ayala and Israel Cruz waited outside to shoot him with a handgun. The plan was ultimately unsuccessful, however, because their intended victim spotted one of his would-be assassins.

At various points that day, Noe Cruz called the police on his cellular phone to inform them of the gang's plan. Although the police were unable to find the gang members before they attempted the murder, the police later located Ayala's vehicle, pulled it over, and discovered the handgun. Ayala was arrested and pled guilty in state court to transporting a firearm.

2.

At some point prior to November 2002, Velasquez became a member of the Teclas clique of MS-13. Velasquez attended meetings, paid dues, and even climbed the ranks to become first word for the clique. Like Ayala, Velasquez was aware of and participated in his clique's violent activities.

One of these was a gang rape or, as MS-13 members call it, a "train." On the morning of May 12, 2003, Velasquez

picked three teenage girls up from a high school under the pretense of taking them to a party. He took them to an apartment, where a few MS-13 members were waiting. At some point thereafter, ten to fifteen more gang members arrived. After realizing that one of the teenage girls was the sister of an MS-13 member, one of the men took the girl outside of the apartment to talk. The gang members remaining inside then forced the two other girls into separate bedrooms and formed lines outside each room. One by one, they entered the rooms to rape the girls, each man being allotted five minutes at a time.

According to one of the girls, Velasquez took her into a bedroom and tried to have sex with her. When she refused his advances, he called two other men into the room. One of these men choked her, while the other held her arms down on the bed. After she started to scream, Velasquez pointed a gun at her head and told her to stay quiet. Ten or so men then took turns entering the room, and all but two of them raped her. At various points, she could see Velasquez standing by the door. Velasquez even entered the room at one point and told her she would have to shower after the men were finished with her.

The other girl provided a similar account. One of the men made sexual advances toward her in the kitchen of the apartment. When she refused, he forced her into one of the bedrooms with the help of other gang members. Approximately thirteen men raped her in that room, and one of them was Velasquez. He entered the room with a gun in his hand, threatened to kill her, and forced her to have intercourse.

Eventually, the third girl reentered the apartment and saw the lines outside the bedrooms. As she started to scream, the gang members dispersed and fled the apartment. The girls then ran outside and called the police.

Velasquez was also involved in the stabbing of a rival gang member. During the early morning hours of September 18,

2004, Velasquez and several other MS-13 members confronted a smaller group of members from a rival gang in the parking lot of a nightclub called the Coco Cabana. They surrounded an individual named Jhony Diaz and proceeded to attack him. During the ensuing melee, Diaz was stabbed ten times. The fight broke up when the police arrived on the scene. The MS-13 members quickly fled, leaving Diaz bleeding on the ground.

## C.

On August 23, 2005, a grand jury in the District of Maryland returned an indictment against Ayala, Velasquez, and several others for crimes arising out of their involvement in MS-13. The district court severed the case and scheduled the first trial against Ayala and Velasquez. On September 18, 2006, the grand jury returned a second superseding indictment, naming only these two defendants.

Both defendants were charged with conspiracy to participate in racketeering activity in violation of 18 U.S.C. § 1962(d). Among other things, the indictment alleged that MS-13 was an enterprise engaged in a pattern of racketeering activities, including murder, kidnapping, robbery, obstruction of justice, witness tampering, and interference with commerce by threats of violence. Both defendants were also charged with a VICAR offense, conspiring to commit assaults with dangerous weapons, in violation of 18 U.S.C. § 1959(a)(6) and 18 U.S.C. § 2.

In addition, Ayala was charged with another VICAR offense, conspiring to commit murder, in violation of 18 U.S.C. § 1959(a)(5) and 18 U.S.C. § 2 in connection with the shooting in Alexandria, Virginia. He also faced a charge for using or carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2 in connection with his trip to Baltimore, Maryland.

Velasquez was also charged with another VICAR offense, assault with a dangerous weapon, in violation of 18 U.S.C. § 1959(a)(3) and 18 U.S.C. § 2 and with using or carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2 in connection with the gang rape. He was also charged with one last VICAR offense, assault with a dangerous weapon, in violation of 18 U.S.C. § 1959(a)(3) and 18 U.S.C. § 2 for his participation in the stabbing of Jhony Diaz.

Both defendants pled not guilty, and a jury convicted them on all counts. The district court subsequently sentenced Ayala to 420 months of imprisonment, five years of supervised release, and a $300 assessment. It sentenced Velasquez to 444 months of imprisonment, five years of supervised release, and a $400 assessment.

On appeal, the defendants raise a number of issues, some individually and some collectively. We address the individual claims first, setting forth additional facts as they become necessary.

## II.

First, Ayala challenges his conviction for conspiring to commit murder in violation of the VICAR statute, 18 U.S.C. § 1959(a)(5). He argues that this murder conspiracy was part of the same course of conduct that constituted the larger racketeering conspiracy for which he was convicted under RICO, 18 U.S.C. § 1962(d). Thus, he contends that he was punished multiple times for the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment.

The Double Jeopardy Clause states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." In the context of a single criminal prosecution, the clause "protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717

(1969). This guarantee simply prevents "the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983); *United States v. Martin*, 523 F.3d 281, 290 (4th Cir. 2008). It does not, however, prohibit the legislature from punishing the same act or course of conduct under different statutes. *Albernaz v. United States*, 450 U.S. 333, 344 (1981).

Thus, when a defendant violates more than one statute in a single course of conduct, a court may impose multiple punishments without violating the Double Jeopardy Clause if the legislature authorizes it to do so. *United States v. Terry*, 86 F.3d 353, 355 (4th Cir. 1996). Ultimately, our "only task is to determine whether Congress intended to impose multiple punishments." *United States v. Chandia*, 514 F.3d 365, 372 (4th Cir. 2008). For "the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them[ ] resides wholly with the Congress." *Whalen v. United States*, 445 U.S. 684, 689 (1980).

To make that determination, we are guided by the Supreme Court's decision in *Blockburger v. United States*, 284 U.S. 299 (1932). "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304. When applying this test in multiple punishment cases, our "exclusive focus" is "upon the elements of the statutory provisions in question," not the particular facts of the underlying case. *United States v. Allen*, 13 F.3d 105, 109 n.4 (4th Cir. 1993). If each provision requires proof of a distinct element, "then multiple punishments are presumed to be authorized absent a clear showing of contrary Congressional intent." *Terry*, 86 F.3d at 356 (citing *Albernaz*, 450 U.S. at 340).

Applying *Blockburger* here, we conclude that Congress intended murder conspiracy under § 1959(a)(5) and racketeer-

ing conspiracy under § 1962(d) to be distinct offenses. Establishing a murder conspiracy under § 1959(a)(5) requires proof that the defendant conspired "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity" or as consideration for "anything of pecuniary value" from such an enterprise. There is simply no such requirement to prove a racketeering conspiracy under § 1962(d). Moreover, establishing a murder conspiracy under § 1959(a)(5) requires proof of a specific conspiracy to "commit murder," a fact which is not a necessary element of a racketeering conspiracy under § 1962(d). Conversely, establishing a racketeering conspiracy under § 1962(d) requires proof of a conspiracy to conduct an enterprise through "a pattern of racketeering activity," which the RICO statute defines as "at least two acts." 18 U.S.C. § 1961(5). Section 1959(a)(5), by contrast, only requires proof of a conspiracy to commit a single act.

Thus, each offense requires proof of at least one fact that the other does not. That is, a jury could find a defendant guilty of one offense without necessarily finding him guilty of the other and vice-versa. Accordingly, "we presume that Congress authorized multiple punishments." *Chandia*, 514 F.3d at 372.

The burden then shifts to Ayala to make a clear showing of contrary legislative intent. *Terry*, 86 F.3d at 356. Ayala has not met that burden, however. If anything, we think that the available evidence suggests that Congress did indeed intend to impose multiple punishments. For one thing, it placed the two offenses in different chapters and provided each with its own penalties. *See* 18 U.S.C. § 1959(a)(1)-(6) (penalties for VICAR violations); § 1963(a)-(m) (penalties for RICO violations). For another, Congress was clearly aware of the RICO statute when it enacted the VICAR statute, given that the latter defines "racketeering activity" by reference to a provision of RICO. *See* 18 U.S.C. § 1959(b)(1) (referencing "section 1961 of this title"). Had it wanted to impose a single punish-

ment when a defendant violated both statutes during the same course of conduct, Congress easily could have said so, yet Ayala points us to no such indication in the text or legislative history of the statutes.

Our conclusion is bolstered by the fact that these statutes are directed at two different but related problems. *See Albernaz*, 450 U.S. at 343. While the RICO statute addresses participation in racketeering enterprises generally, the VICAR statute addresses the particular danger posed by those, like Ayala, who are willing to commit violent crimes in order to bolster their positions within such enterprises. In this sense, the VICAR statute "complements" the RICO act by allowing the government to address these interrelated problems. *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992).

We find additional support in the case law of other circuits. The Second Circuit, for instance, has held that a defendant may be punished in a single prosecution for substantive violations of both the RICO and VICAR statutes. *United States v. Polanco*, 145 F.3d 536, 542 (2d Cir. 1998). Likewise, the First Circuit has held that a defendant may be punished for both a VICAR conspiracy and a substantive RICO offense. *United States v. Marino*, 277 F.3d 11, 39 (1st Cir. 2002); *United States v. Nascimento*, 491 F.3d 25, 48 (1st Cir. 2007) (same). In the related context of successive prosecutions, the Third Circuit has rejected a double jeopardy challenge where the first prosecution included a RICO conspiracy charge and the second included a VICAR conspiracy charge. *United States v. Merlino*, 310 F.3d 137, 141 (3d Cir. 2002). It observed that "[b]ecause that VICAR offense requires proof of an element that the RICO offense does not, and vice-versa, they are different offenses for the purposes of the Double Jeopardy Clause." *Id.* While the exact scenarios in these cases differ, the consensus is that the VICAR and RICO statutes create separate punishable offenses.

Thus, we conclude that there is no Double Jeopardy bar to punishing a defendant for both a murder conspiracy under

§ 1959(a)(5) and a racketeering conspiracy under § 1962(d) when the offenses arise out of the same course of conduct.

### III.

Next, Ayala challenges his conviction under 18 U.S.C. § 924(c) for using or carrying a firearm during and in relation to a crime of violence on August 23, 2005. The government's theory was that the crime of violence in question was the RICO conspiracy for which Ayala was also convicted in this case. At trial, Ayala moved for judgment of acquittal on the § 924(c) charge, arguing that the RICO conspiracy was not a crime of violence. The district court denied the motion, however, reasoning that the conspiracy qualified as a crime of violence because the predicate acts alleged in the indictment were themselves violent.

On appeal, Ayala renews his argument that the RICO conspiracy was not a crime of violence under § 924(c). He notes that many RICO predicate acts are not violent crimes, and he faults the government for not specifying in the indictment which predicate act he intended to commit on the day he possessed the firearm. He further contends that we may not look to the particular facts of the case to determine whether he was involved in a violent crime that day.

Ayala's argument is misplaced. We have recognized that a conspiracy can itself be "a separate crime of violence providing its own predicate for § 924(c)(1) liability." *United States v. Phan*, 121 F.3d 149, 152-53 (4th Cir. 1997). It is therefore immaterial that the government did not specify which predicate act was intended on the day at issue. The question is simply whether the RICO conspiracy itself was a crime of violence under § 924(c).

Section 924(c) defines a crime of violence as, among other things, a felony "that by its nature, involves a substantial risk that physical force against the person or property of another

may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B). Under this definition, a conspiracy "is itself a crime of violence when its objectives are violent crimes." *United States v. Elder*, 88 F.3d 127, 129 (2d Cir. 1996). This is because "[w]hen conspirators have formed a partnership in crime to achieve a violent objective, . . . they have substantially increased the risk that their actions will result in serious physical harm to others." *United States v. White*, 571 F.3d 365, 371 (4th Cir. 2009) (making this observation when interpreting 18 U.S.C. § 924(e)).

To determine whether the objectives of this conspiracy were violent crimes, we need not delve into the particular facts of the case as Ayala contends. Instead, the question is intrinsic to the indictment itself. Here, the indictment charges a pattern of violent racketeering activities, including murder, kidnapping, and robbery. It is hard to imagine a conspiracy which, by its nature, poses more of a risk that physical force will be used against persons or property. Other courts have held that RICO conspiracies that surely posed less risk qualified as crimes of violence under similarly worded statutes. *See*, *e.g.*, *United States v. Ciccone*, 312 F.3d 535, 541-42 (2d Cir. 2002) (holding that a RICO conspiracy to commit extortion was a crime of violence under the Bail Reform Act); *United States v. Juvenile Male*, 118 F.3d 1344, 1350 (9th Cir. 1997) (holding that a RICO conspiracy to commit robberies affecting interstate commerce was a crime of violence under the Juvenile Delinquency Act). Thus, we have no difficulty in concluding that a RICO conspiracy to commit crimes including murder, kidnapping, and robbery is by its nature a crime of violence under § 924(c)(3)(B). Accordingly, we find no error in the district court's ruling and affirm Ayala's conviction under that section.

## IV.

Next, Ayala raises several evidentiary claims, which we address in turn. First, Ayala challenges the admission of state-

ments under the coconspirator exception to the hearsay rule. *See* Fed. R. Evid. 801(d)(2)(E). Ayala contends that the district court permitted MS-13 members to testify about discussions that took place at clique meetings without attributing statements to particular declarants. In Ayala's view, this was in error because the declarant of these statements may have been Noe Cruz, who was a government informant and thus not a member of the conspiracy. We review a district court's decision to admit coconspirator statements for abuse of discretion, *United States v. Blevins*, 960 F.2d 1252, 1255 (4th Cir. 1992), and find no such abuse here.

For a statement to be admissible under Rule 801(d)(2)(E), there "must be evidence [1] that there was a conspiracy involving the declarant and the nonoffering party, and [2] that the statement was made 'during the course and in furtherance of the conspiracy.'" *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). Regarding the first requirement, it is not necessary for the offering party to identify the declarant by name. *See United States v. Squillacote*, 221 F.3d 542, 564 (4th Cir. 2000) (admitting an unsigned document under Rule 801(d)(2)(E) "notwithstanding the government's inability to identify the declarants"). Instead, the offering party need only "show that the unknown declarant was more likely than not a conspirator." *United States v. Helmel*, 769 F.2d 1306, 1313 (8th Cir. 1985).

Here, Ayala's concern appears to be that an unattributed statement may have been made by Cruz, rather than by a member of the conspiracy. But it is not clear which statements Ayala is complaining about. Although he frames his argument in broad terms, he admits that it is "hard to find" any examples where Cruz's statements may actually have come into evidence. Br. of Appellants at 22.

In fact, Ayala produces only one possible example from the entire record. MS-13 member Emilia Masaya testified about a meeting where she learned from an unidentified declarant

that Ayala was arrested after going to Baltimore, Maryland to commit a murder. Ayala contends that this statement must have come from Cruz, but the record does not back up this claim. To be sure, it was later revealed at trial that Cruz attended the meeting in question, but there is no indication either way about whether he was the one who brought up the matter. He certainly knew about the arrest prior to the meeting, but the record indicates that other gang members did as well. And given that Masaya was repeating a comment from a meeting where all but one of the attendees were coconspirators, we cannot conclude that the district court abused its discretion in admitting the statement. In any event, we find that the statement was harmless under Federal Rule of Criminal Procedure 52(a) in light of the substantial other evidence at trial about Ayala's arrest and the events leading up to it.

In his brief, Ayala also cites a number of instances where Noe Cruz testified about statements made by other MS-13 members at clique meetings and gatherings. For example, Cruz recalled a meeting where Moriera told the Sailors clique that he had murdered Calderon and then cautioned the members not to act as Calderon had. To the extent that Ayala is challenging these statements, we find that they were clearly admissible under the coconspirator exception. The fact that Cruz was not a member of the conspiracy at the time he heard these remarks is simply irrelevant to their admissibility under Rule 801(d)(2)(E). All that is required is that a statement be made *by* one of the defendant's coconspirators, not *to* a coconspirator, in the course and in furtherance of the conspiracy. *See*, *e.g.*, *United States v. Williamson*, 53 F.3d 1500, 1519 (10th Cir. 1995); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989).

Indeed, this court has previously recognized that statements "made by a co-conspirator to a third party who is not then a member of the conspiracy" are admissible when made in the course and furtherance thereof. *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994). Accordingly, that a comment

was made to or in the presence of a government informant does not, without more, render it inadmissible under Rule 801(d)(2)(E). *See*, *e.g.*, *United States v. Mealy*, 851 F.2d 890, 901 (7th Cir. 1988). Here, the statements were made by Ayala's coconspirators and they regarded the gang's criminal activities and efforts to maintain discipline. Thus, the statements were plainly admissible under the coconspirator exception, notwithstanding the fact that Cruz was an informant at the time he heard them.

## V.

Second, Ayala argues that the district court erred by admitting evidence of a guilty plea he made in state court. The facts relevant to this claim are as follows.

## A.

As discussed above, Ayala was arrested on February 23, 2005 and charged in state court with transporting a firearm. Laura Gwinn, an assistant state's attorney, handled his case. At the time, Gwinn was aware that there was an ongoing investigation into the activities of MS-13 that could lead to federal RICO charges. In fact, she would later be designated as a special assistant prosecutor in the resulting federal case. She was not, however, a federal prosecutor at the time she handled Ayala's state case.

At some point prior to July 2005, Gwinn contacted Ayala's counsel to discuss the possibility of a plea agreement for the firearms charge. Gwinn proposed that Ayala enter a guilty plea in return for a sentence of nine months of imprisonment and three years of probation. Ayala's counsel then proposed that the nine months be served as home detention. Gwinn agreed, and Ayala entered a guilty plea pursuant to these terms on July 18, 2005. At no point did Gwinn disclose the existence of the ongoing investigation.

Ayala was released on home detention on August 5, 2005. Then on August 23, 2005, a federal grand jury indicted him for crimes arising out of his involvement in MS-13, which led to the instant prosecution. At trial in this case, the government sought to introduce Ayala's guilty plea as evidence that he possessed a firearm on February 23, 2005. Ayala objected, arguing that his plea was involuntary because he was not informed that the plea might be used against him in a subsequent federal prosecution. After careful consideration, the district court rejected the argument and admitted evidence of the guilty plea under Federal Rule of Evidence 801(d)(2)(A) as an admission by a party-opponent.

B.

On appeal, Ayala argues that his state court plea was constitutionally invalid and thus inadmissible because he was not informed that it might be used as evidence against him in a future federal prosecution.

So far as we are aware, Ayala has never raised any objection to the validity of his state plea before this time, and a strong presumption of validity attaches to a plea that has never been questioned and no court has found infirm. As the First Circuit has noted, there is a question about whether this is even the appropriate venue to be litigating the plea's validity. "Ordinarily, it is inappropriate for a federal court to review such a claim without allowing the state courts a prior opportunity to do so." *United States v. Bouthot*, 878 F.2d 1506, 1511 (1st Cir. 1989). Even apart from the fact that Ayala has never sought before this moment to withdraw the plea, the district court's decision to admit it was sound.

For a guilty plea to be constitutionally valid, a defendant must be informed of the "direct" but not the "collateral" consequences of the plea. *Cuthrell v. Dir., Patuxent Inst.*, 475 F.2d 1364, 1365 (4th Cir. 1973); *see also Brady v. United States*, 397 U.S. 742, 755 (1970). This distinction "turns on

whether the result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment." *Cuthrell*, 475 F.2d at 1366. While this distinction may be elusive in some cases, it is not so here.

Whether a guilty plea in state court might be used in a subsequent federal prosecution is plainly a collateral consequence. In our system of dual sovereigns, state and federal courts run on separate tracks; thus, a guilty plea in one does not automatically lead to consequences in the other. As the Seventh Circuit has explained, "the state court has no direct role in federal prosecutions. The state and federal systems are separate and distinct, and the defendant need only be informed of the direct consequences he may face within the particular system." *United States v. Long*, 852 F.2d 975, 979 (7th Cir. 1988); *accord United States v. Williams*, 104 F.3d 213, 216 (8th Cir. 1997); *United States v. Maestas*, 941 F.2d 273, 279 (5th Cir. 1991); *Bouthot*, 878 F.2d at 1511.

This analysis holds even where, as here, state officials are aware of a pending federal investigation in which the defendant's guilty plea might be used. *Bouthot*, 878 F.2d at 1511-12; *United States v. Jordan*, 870 F.2d 1310, 1317 (7th Cir. 1989). In these circumstances, federal prosecution is not automatic. Instead, it turns on whether federal officials elect to bring a charge, a choice over which state officials have no control. *See Jordan*, 870 F.2d at 1317 ("[F]ederal prosecution was only a possibility over which the State's Attorney had no control . . . ."). As the district court observed in this case, after Ayala pled guilty in state court, federal prosecutors still had to decide "what charges they would seek to bring and whether, indeed, Mr. Ayala would even be involved." Thus, we conclude that Ayala's plea was not invalid simply because he was not informed of the possibility that it might be used against him in a subsequent federal prosecution. Indeed, this possibility is obvious and exists in almost every case, particularly cases that involve firearms.

Ayala also alleges that the state prosecutor somehow misled him into entering the plea agreement. He argues that Gwinn's failure to disclose the possibility of a federal prosecution was tantamount to misrepresentation because it left him with the impression that he would be able to serve out his state sentence without interruption.

This misrepresentation claim is little more than a repackaging of the one above. We reject it as well. The district court concluded that Gwinn never "said anything that [was] misleading," nor did she make a "promise to Mr. Ayala that he would not be prosecuted in Federal Court for crimes arising out of the event that was the subject of his guilty plea." Ayala does not contest those findings, and we decline to equate a prosecutor's silence about collateral consequences with misrepresentation. The cases simply prohibit prosecutors from making false statements or breaking promises. *See*, *e.g.*, *Santobello v. New York*, 404 U.S. 257, 262 (1971). They most certainly do not "place an affirmative duty on the prosecution to discuss all possible ramifications of a defendant's guilty plea." *Jordan*, 870 F.2d at 1316.

Accordingly, Gwinn did not engage in misrepresentation by remaining silent about the federal investigation. If anything, Gwinn may well have had an obligation not to discuss it. It appears that Gwinn knew about the federal grand jury, in which case she likely was barred from disclosing its existence under Federal Rule of Criminal Procedure 6(e). But at a minimum, she risked seriously jeopardizing that investigation had she disclosed its existence to a known member of MS-13.

For these reasons, we find no error in the district court's decision to admit evidence of Ayala's guilty plea.[1]

---

[1]Ayala also claims that Gwinn offered him the plea as a ruse to place him on home detention to provide the justification for the search of his residence weeks later. This claim fails for numerous reasons, namely that Ayala voluntarily opted for the benefit of home detention as opposed to imprisonment, that he violated a court order by his continuing contact with MS-13 members while in the home, and that irrespective of his home detention, the address was one long associated with him and likely would have been the subject of a search in any event.

## VI.

Third, Ayala challenges the admission of statements that he and his fellow MS-13 members made before a state grand jury. The relevant facts are as follows.

## A.

In July 2004, three members of the Sailors clique—Noe Cruz, Israel Cruz, and Santos Garcia—were subpoenaed to testify before a state grand jury. The grand jury was investigating a gang-related murder committed by Ayala's brother and two other MS-13 members in Suitland, Maryland. Ayala and Emilia Masaya had not been subpoenaed but decided to accompany the others to the courthouse on the day in question. Prior to entering the courthouse, all five MS-13 members met at a nearby restaurant, where they agreed to deny their knowledge of the murder.

After the group arrived at the courthouse, an investigator approached Ayala about the possibility of testifying before the grand jury. He informed Ayala that he would be subpoenaed at a later date and gave him the option to go ahead and testify that day. He also advised Ayala that he had the right to an attorney.

Ayala elected to testify that day. After Ayala was sworn in, the state's attorney informed him that he had a right against self-incrimination and the right to an attorney. Ayala stated that he understood those rights and did not wish to be represented. He then proceeded to testify, falsely denying that his brother had spoken with him about the murder.

Israel Cruz and Santos Garcia also testified before the grand jury and denied any knowledge of the murder. In order to maintain the cover of Noe Cruz, the government informant, the state's attorney called him before the grand jury and told him the questions she had asked the others. After leaving the

courthouse, the gang members discussed the fact that they had lied to the grand jury as planned.

At trial in this case, the government sought to introduce the grand jury statements of Israel Cruz, Santos Garcia, and Ayala as evidence that they obstructed justice in furtherance of the RICO conspiracy. Ayala argued (1) that the testimony of Cruz and Garcia was inadmissible under the Confrontation Clause and (2) that his own testimony was inadmissible because he had not been informed that he had a right to appointed counsel. The district court rejected both arguments and admitted the statements. On appeal, Ayala challenges both rulings.

B.

Ayala argues that the district court admitted the grand jury statements of Israel Cruz and Santos Garcia in violation of the Confrontation Clause. He contends that these statements were "testimonial" and thus inadmissible under *Crawford v. Washington*, 541 U.S. 36 (2004), given that he did not have an opportunity to cross-examine either individual.

*Crawford* generally bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54. To be sure, sworn statements before a grand jury are plainly testimonial. *See id.* at 51-52 (providing examples of the "core class" of testimonial statements including "formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions") (internal quotation omitted). But *Crawford* is quite explicit that the Confrontation Clause does not eliminate the use of testimonial statements across the board. As the Court explained, it "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 60 n. 9.

Here, the district court admitted the statements not for their truth but merely to prove that Cruz and Santos made certain denials before the grand jury. "[E]vidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement." *Anderson v. United States*, 417 U.S. 211, 220 n.8 (1974). As the district court explained, the statements were the equivalent of a "physical exhibit that demonstrates that words were spoken." By introducing them, the government was simply laying a foundation to show that the statements were false and made in furtherance of the conspiracy. It did so by calling at trial witnesses Noe Cruz and Emilia Masaya, who testified about the group's plan to cover up their knowledge of the murder and who, of course, were subject to cross-examination. Accordingly, the admission of the grand jury statements did not violate the Confrontation Clause.

## C.

Next, Ayala argues that his own grand jury testimony was improperly obtained because he was not informed that he had a right to appointed counsel under the Sixth and Fourteenth Amendments. This claim is easily dismissed. It is well established that the Sixth Amendment right to counsel "does not attach until a prosecution is commenced" against a defendant. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Commencement refers to "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Gouveia*, 467 U.S. 180, 188 (1984) (internal quotation omitted). Although Ayala was the subject of an ongoing investigation, he had not been charged at the time he testified before the grand jury. Thus, his Sixth Amendment right to counsel had not yet attached, and we find no error in the district court's decision to admit his statements. *Accord*, *e.g. United States v. Myers*, 123 F.3d 350, 359 (6th Cir. 1997); *United States v. Vasquez*, 675 F.2d 16, 17 (2d Cir. 1982).

VII.

We now turn to Velasquez's claims. Velasquez argues that the district court unduly limited his ability to cross-examine the two teenage victims of the gang rape. Specifically, he claims that the district court erred by precluding him from inquiring about the girls' prior inconsistent statements, their medical treatment, and their psychiatric treatment. We review restrictions on cross-examination for abuse of discretion. *United States v. Ambers*, 85 F.3d 173, 175 (4th Cir. 1996).

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant an opportunity for effective cross-examination. *See Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). The clause does not, however, confer the right to cross-examine "in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). District courts thus "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Although Velasquez asserts that the district court seriously hampered his ability to cross-examine the witnesses, the record reveals an entirely different story. The court permitted Velasquez's counsel to question the witnesses on a wide variety of matters including whether they had previously skipped school, whether they used alcohol, what clothing one of them wore, and whether they had voluntarily kissed and danced with some of the men at the apartment. By contrast, the limitations he complains about were minor.

Velasquez first contends that the district court unduly limited his ability to question the victims about their prior statements. The record shows, however, the court permitted his

counsel to question the girls at quite some length on discrepancies between statements they gave to police and to medical examiners. The court merely sustained objections when Velasquez's counsel put his questions in improper form by, among other things, assuming facts not in evidence, calling for speculation, or asking the witnesses to comment on the veracity of others. The district court plainly had discretion to require Velasquez's counsel to abide by these elementary precepts to ensure that the jury was not misled, and these restrictions did nothing to limit the substance of his questioning.

Velasquez next complains that he should have been given more freedom to examine the victims' medical treatment, but this claim is meritless as well. In the only example he cites, one of the girls testified that she had not been on any medication at the time of the gang rape. Velasquez's counsel then asked her whether she was currently on any medication, and the district court sustained the government's objection after his counsel failed to proffer any relevant basis for the question. Given this failure by counsel, there was clearly no abuse of discretion by the district court.

Lastly, Velasquez challenges the district court's decision not to allow him to ask one girl whether she was under the care of any counselor, psychotherapist, or psychiatrist. We have previously cautioned that permitting a defendant to cross-examine an adverse witness on such matters tends to be "unnecessarily demeaning" and will "generally introduce into the case a collateral issue, leading to a large amount of testimony substantially extraneous to the essential facts and issues of the controversy being tried." *United States v. Lopez*, 611 F.2d 44, 45 (4th Cir. 1979). Thus, district courts should "weigh the potential unfairness of a free wheeling inquiry intended to stigmatize the witness against whatever materiality the evidence might have." *Id.* at 46 (internal quotation omitted). Here, it is not clear what relevance, if any, this information had because Velasquez's counsel did not explain his reasons for asking the question. Moreover, the district

court was rightly concerned about the danger of demeaning a witness who had already endured one horrific and humiliating experience. Accordingly, we find no abuse of discretion here.[2]

## VIII.

We now turn to the defendants' collective claims. Both defendants challenge the district court's decision not to instruct the jury on the definition of reasonable doubt. But "the well-established rule of this Circuit is that although the district court may define reasonable doubt to a jury . . . the district court is not required to do so." *United States v. Walton*, 207 F.3d 694, 696-97 (4th Cir. 2000) (en banc). As we have observed, "attempting to explain the words 'beyond a reasonable doubt' is more dangerous than leaving a jury to wrestle with only the words themselves." *Id.* at 698. Accordingly, the district court did not err in declining to issue such an instruction.

## IX.

Lastly, the defendants contend that the district court admitted the testimony of three expert witnesses in violation of the

---

[2]Velasquez also challenges the district court's exclusion of love letters and family photographs that he ostensibly submitted to show that he did not write or dress like a typical MS-13 member. The district court found the letters irrelevant because the government had not put on evidence that gang members always wrote in a particular fashion. It likewise found the photographs irrelevant because they were either taken before he entered the gang or simply did not show him wearing clothes that were inconsistent with gang membership. We find no error in these rulings.

Lastly, Velasquez challenges the sufficiency of the evidence supporting his convictions for RICO conspiracy in violation of 18 U.S.C. § 1962(d), use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2, and assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3) and 18 U.S.C. § 2. After carefully reviewing the record, we find that the evidence was sufficient to support the jury's verdict on each of these counts.

Confrontation Clause as interpreted by *Crawford v. Washington*, 541 U.S. 36 (2004), because the experts relied in part on interviews with unnamed declarants. The facts relevant to this claim are as follows.

A.

At trial, the government called three experts on the history, structure, and practices of MS-13 to the stand. First, Detective Frank Flores of the Los Angeles Police Department provided a general overview of the gang's history, structure, and operations. Second, a police officer from El Salvador, appearing under a pseudonym for his own protection, testified about the gang's structure and its activities in El Salvador. Third, Sergeant George Norris of the Prince George's County Police Department testified that some items seized during the investigation, such as membership rolls and dues sheets, were likely associated with MS-13.

Each expert based his opinion on extensive experience investigating MS-13. Sergeant Norris, for instance, explained that he had conducted surveillance of the gang on many occasions and had participated in the execution of over fifty search warrants related to the gang. Each expert stated that much of his knowledge about the gang resulted from interviews with gang members, the families of gang members, and the gang's victims. Detective Flores, for example, remarked he had personally "contacted or interviewed well over 500" MS-13 members over the last seven and a half years.

B.

In *Crawford*, the Supreme Court held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54. "[F]or a statement to be testimonial," we have explained, "the declarant must

have had a reasonable expectation that his statement would be used prosecutorially." *United States v. Udeozor*, 515 F.3d 260, 269 (4th Cir. 2008).

Here, the defendants acknowledge that the experts' testimony was proper under Federal Rule of Evidence 703, which permits experts to rely on otherwise inadmissible evidence if "of a type reasonably relied upon by experts in the particular field." But they contend that *Crawford* silently invalidated Rule 703 insofar as it permits experts to rely on statements, such as the interviews here, that happen to be testimonial.

We have previously rejected this very argument. While "*Crawford* forbids the introduction of testimonial hearsay as evidence in itself," it does not "prevent[ ] expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence." *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009). In *Johnson*, we recognized the danger, however, that an expert might be "used as little more than a conduit or transmitter for testimonial hearsay." *Id.* Accordingly, we held that the question when applying *Crawford* to expert testimony is "whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay." *Id.*

Applying that test here, we find no *Crawford* violation. As an initial matter, it is unclear whether the interviews these experts relied on were even testimonial, given that the record is rather bare about the circumstances in which they were conducted. But even if we assume that each expert did rely on testimonial statements, that fact alone does not offend the Confrontation Clause because the experts did not act as mere transmitters and in fact did not repeat statements of particular declarants to the jury. Instead, they offered their independent judgments, most of which related to the gang's general nature as a violent organization and were not about the defendants in particular. These judgments resulted from many years of

observing the gang, studying its methods, and speaking with its members. Given that each expert was subject to cross-examination about his judgment, we find no error in the admission of their testimony.

## X.

For the reasons above, the judgment of the district court is

*AFFIRMED*.