

# IN THE
# TENTH COURT OF APPEALS

_____

## No. 10-12-00095-CR

**MARCO AGUNDIZ CABRERA,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

_____

**From the 85th District Court**
**Brazos County, Texas**
**Trial Court No. 10-03842-CRF-85**

_____

## MEMORANDUM  OPINION

_____

Appellant Marco Agundiz Cabrera was found guilty by a jury of engaging in organized criminal activity with respect to committing or attempting to commit aggravated assault.  The jury assessed a prison sentence of sixty years and a $10,000 fine.  Raising one issue, Agundiz Cabrera appeals.

The offense of engaging in organized criminal activity is committed if a person commits aggravated assault with the intent to establish, maintain, or participate in a criminal street gang.  TEX. PENAL CODE ANN. § 71.02(a)(1) (West Supp. 2013).  A criminal

street gang "means three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." *Id.* § 71.01(d) (West 2011).

To prove that Agundiz Cabrera was a member of a criminal street gang at the time of the alleged aggravated assault, the State presented the testimony of Bryan Police Officer Andrea Schooler, the gang intelligence officer for the Criminal Intelligence Unit and a ten-year veteran of the Bryan Police Department. Schooler testified that, before becoming the gang intelligence officer, she was a Bryan patrol officer for six years. She was predominately assigned to a zone considered to have the highest volume of gang activity and responded to numerous fights, drive-by shootings, and assaults that involved gang members. She said that the Bryan Police Department maintains a gang database and that when patrol officers learn that a crime is gang-related, they get that information to the officers responsible for entering the information in the gang database.

Schooler then was a member of a county-wide task force (the Special Investigations Unit) for gangs, narcotics, and organized crime for two and a half years. In that task force, she primarily focused on gang intelligence, had a gang database, and received a "large number of hours of training in gangs and narcotics investigations."

Next, in 2010, Schooler was assigned to the Criminal Intelligence Unit, where her primary focus is on gangs. As the criminal intelligence officer on gangs, she maintains the gang database, trains officers on gang recognition (signs and symbols) and gang members, and supports other areas of law enforcement with criminal investigations

involving gang members. And by talking with gang members, Schooler has learned the internal structure and workings of gangs. Schooler testified at length about the many gang training courses and conferences that she has attended to date, and they totaled 196 hours. She is a member of the Texas Gang Investigators Association.

Schooler said that, through her training, and experience, she has acquired specialized knowledge relating to gangs and specifically the Latin Kings, the Sureños, and the Vatos Locos. She has previously testified in Brazos County as an expert on those gangs. Regarding the Latin Kings, Schooler testified that, on a local level from 2008 to the present, the Latin Kings had three or more persons grouped under that name with identifiable signs and symbols; their primary colors are black and gold and a five-point crown or star is used. The numbers 12 and 11 are very important because L and K are the twelfth and eleventh letters in the alphabet, and the number 5 is also important. Their hand signs include "amor de rey" (love of king) and the pitchfork sign with the forks down, and because of the number 5's importance, they also use the "five" hand sign. Schooler said that street gang members carry "flags," which is usually a bandanna, and in the case of the Latin Kings, they will have a black or gold bandanna or a black-and-gold bandanna. Necklaces are unique to the Latin Kings, and theirs has five black and then five gold beads, alternating all the way around.

Schooler also testified that, based on her training and experience, the Latin Kings are a known Brazos County criminal street gang that regularly associates in criminal activities such as graffiti, property crimes, burglary, narcotics, assaults and aggravated assaults, retaliation, and murder. The Latin Kings are the largest gang in Brazos

County, and their rival gangs are the Sureños and the Vatos Locos. Schooler testified that, for determining whether a person is a member of gang and to put the person in the gang database, she goes by the criteria in Chapter 61 of the Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 61.02 (West Supp. 2013).

Before Schooler testified, Angelica Guzman testified and authenticated two photographs (State's Exhibits 11 and 12) as being taken on October 8, 2008. Guzman said that she and Agundiz Cabrera were in those two photographs. Also testifying was Terry Young, an investigator with the Brazos County Sherriff's Office; he, like Schooler, had been a member of the Special Investigations Unit where he focused primarily on street gangs. Young said that on October 8, 2008, he and two other investigators were conducting surveillance and taking photographs of persons at the funeral for Jose Reyna, whom Schooler later said was a known member of the Latin Kings and had been murdered. Young said that Agundiz Cabrera was at that funeral, and Young authenticated four photographs (State's Exhibits 7, 8, 9, and 10) that were taken at the funeral. Agundiz Cabrera and others were in all of the photographs.

The trial court prohibited Schooler from testifying that Agundiz Cabrera was a member of the Latin Kings because she did not have personal knowledge that he was a member at the time of the underlying offense, but over Agundiz Cabrera's Confrontation objections, Schooler was allowed to identify other persons in the several photographs as members of the Latin Kings because they were in the gang database. For example, for State's Exhibit 11, Schooler testified that, excluding Agundiz Cabrera, all of the persons were members of the Latin Kings.

In his sole issue, Agundiz Cabrera, citing *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), asserts a Confrontation Clause violation because the trial court allowed Schooler to testify over objection that other persons pictured with Agundiz Cabrera and dressed similarly to him were gang members. Agundiz Cabrera argues that the gang database is the result of hearsay information from many different law enforcement officers and that Schooler lacked personal knowledge to testify that those persons were gang members; instead, she relied on hearsay from other officers.

We review the trial court's ruling admitting the evidence against a constitutional objection under a bifurcated standard, giving deference to the trial court's findings regarding any pertinent historical facts but reviewing de novo the trial court's application of the law to those facts. *Grey v. State*, 299 S.W.3d 902, 907 (Tex. App.—Austin 2009, pet. ref'd) (citing *Wall v. State*, 184 S.W.3d 730, 742-43 (Tex. Crim. App. 2006)).

> The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend VI. This procedural guarantee applies to both federal and state prosecutions. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 1067-68, 13 L.Ed.2d 923 (1965); *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). Consistent with the Confrontation Clause guarantee, a testimonial hearsay statement may be admitted in evidence against a defendant "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 1373-74, 158 L.Ed.2d 177 (2004); *see De La Paz*, 273 S.W.3d at 680. "[T]he *Crawford* rule reflects the Framers' preferred mechanism (cross-examination) for ensuring that inaccurate out-of-court testimonial statements are not used to convict an accused." *Whorton v. Bockting*, 549 U.S. 406, 418, 127 S.Ct. 1173, 1182, 167 L.Ed.2d 1 (2007); *De La Paz*, 273 S.W.3d at 680. "Generally, speaking, a hearsay statement is 'testimonial' when the surrounding circumstances

objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *De La Paz*, 273 S.W.3d at 680.

*Pollard v. State,* 392 S.W.3d 785, 792 (Tex. App.—Waco 2012, pet. ref'd).

In response, the State argues that *Crawford* does not prevent expert witnesses from offering their independent judgments merely because their judgments were in some part formed by their exposure to otherwise inadmissible evidence. Relying on *United States v. Palacios,* 677 F.3d 234 (4th Cir.), *cert. denied,* 133 S.Ct. 124 (2012), the State contends that Schooler gave her independent judgment as a gang expert that applied her training and experience to the information before her that produced "an original product that can be tested through cross-examination." *Id.* at 243. We agree.

Rule of Evidence 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by, reviewed by, or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

TEX. R. EVID. 703. Under this rule, an expert may base an opinion solely on hearsay. *Martinez v. State,* 22 S.W.3d 504, 508 (Tex. Crim. App. 2000); *Aguilar v. State,* 887 S.W.2d 27, 29 & n.8 (Tex. Crim. App. 1994).

In *Palacios*, the Fourth Circuit addressed the defendant's Confrontation objection to the gang expert's testimony that relied in part on interviews with unnamed gang members and victims of gang violence.

> Federal Rule of Evidence 705 allows an expert witness to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed." This includes inadmissible evidence—including

hearsay—"[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." FED. R. EVID. 703; *see also United States v. Leeson,* 453 F.3d 631, 637 (4th Cir. 2006) (holding that a district court did not abuse its discretion by admitting expert testimony based on hearsay when it had been "sufficiently established" that such hearsay statements were the type of information "reasonably relied upon by experts in [the] field").

Under *Crawford*, testimonial hearsay raises special concerns, however, because it implicates a defendant's constitutional rights. *See United States v. Johnson,* 587 F.3d 625, 635 (4th Cir. 2009). *Crawford* established that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54, 124 S.Ct. 1354. The Supreme Court has not provided a definitive definition of "testimonial," but a statement "procured with a primary purpose of creating an out-of-court substitute for trial testimony" is the quintessential example of testimonial hearsay. *Michigan v. Bryant,* ___ U.S. ___, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011). Although "*Crawford* forbids the introduction of testimonial hearsay as evidence in itself," we have recognized that "it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence." *Johnson,* 587 F.3d at 635. The touchstone for determining whether an expert is "giving an independent judgment or merely acting as a transmitter for testimonial hearsay" is whether an expert "is applying his training and expertise to the sources before him," thereby producing "an original product that can be tested through cross-examination." *Id.*

Applying this test, we rejected a claim identical to the one before us in *United States v. Ayala,* 601 F.3d 256 (4th Cir. 2010). *Ayala* involved the same MS–13 conspiracy we confront here, and similar to Palacios, the appellants in that case claimed that the district court's admission of the expert testimony of Sergeant Norris and two other law enforcement officials violated their Confrontation Clause rights because the testimony "relied in part on interviews with unnamed declarants." *Id.* at 274. We held that no *Crawford* violation had occurred, observing:

As an initial matter, it is unclear whether the interviews these experts relied on were even testimonial, given that the record is rather bare about the circumstances in which they were conducted. But even if we assume that each expert did rely on testimonial

statements, that fact alone does not offend the Confrontation Clause because the experts did not act as mere transmitters and in fact did not repeat statements of particular declarants to the jury. Instead, they offered their independent judgments, most of which related to the gang's general nature as a violent organization and were not about the defendants in particular. These judgments resulted from many years of observing the gang, studying its methods, and speaking with its members. Given that each expert was subject to cross-examination about his judgment, we find no error in the admission of their testimony.

*Id.* at 275.

Here, Sergeant Norris explained the bases for his expertise regarding MS–13. These included extensive gang culture training, interactions with other law enforcement officers who specialize in gangs, personal observation through surveillance and executing search warrants, and "[h]undreds and hundreds ..., if not thousands" of interviews with MS–13 members and victims of MS–13 gang violence. J.A. 637. As in *Ayala*, the record before us is unclear as to whether these interviews were testimonial. *See* 601 F.3d at 275. Palacios, in fact, makes no assertion that they were. Assuming at least some of the interviews Norris conducted produced testimonial hearsay, however, Norris did not specifically reference any of these interviews during his expert testimony, nor did he make any mention of Palacios in particular. Rather, he used these interviews, along with the other sources of his extensive knowledge about MS–13, to form an independent opinion about the gang's history, operation, structure, practices, and symbols. Norris was available for cross-examination regarding this opinion. As such, we reiterate our position in *Ayala* that the admission of Norris's testimony was not a *Crawford* violation, even if his expert opinion was based, in part, on testimonial hearsay.

*Palacios,* 677 F.3d at 242-44.

Likewise, we conclude that Schooler's testimony that the other persons in the photographs were gang members did not violate the Confrontation Clause because her testimony demonstrated her training and experience with criminal street gangs in general and specifically with the Latin Kings and produced an original product that

could be, and was, tested by cross-examination.

We overrule Agundiz Cabrera's issue and affirm the trial court's judgment.


                                        REX D. DAVIS
                                        Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed May 8, 2014
Do Not Publish
[CRPM]