UNITED STATES of America,
Appellee,

v.

Anthony CICCONE, also known as "Sonny"; Richard V. Gotti; Primo Cassarino; Jerome Brancato, also known as "Jerry"; Richard G. Gotti; Peter Piacenti, also known as "Pete 17"; Richard Bondi; Frank Scollo, also known as "Red," also known as "The little guy"; Vincent Nasso, also known as "Dr. Nasso"; Julius R. Nasso, also known as "Jules"; Anthony Pansini; Salvatore Cannata; Anna Eylenkrig; Thomas Lisi; Carmine Malara; Jerome Orsino, Jr., Defendants,

Peter Gotti, Defendant–Appellant.

United States Of America, Appellant,

v.

Peter Gotti, Defendant–Appellee.

Docket Nos. 02–1472, 02–1521.

United States Court of Appeals,
Second Circuit.

Argued: Oct. 4, 2002.

Decided: Dec. 4, 2002.

Gerald L. Shargel, Law Offices of Gerald L. Shargel, New York, NY, (Marc Fernich, Sarita Kedia, Henry E. Mazurek, on the briefs), for Defendant–Appellant/Defendant–Appellee.

Andrew M. Genser, Assistant United States Attorney for the Eastern District of New York, Brooklyn, N.Y. (Emily Berger, Assistant United States Attorney, Peter A. Norling, Assistant United States Attorney, David C. James, Assistant United States Attorney, Katya Jestin, Assistant United States Attorney, and Roslynn R. Mauskopf, United States Attorney, on the briefs), for Appellee/Appellant.

Before CARDAMONE, MINER, and SOTOMAYOR, Circuit Judges.

MINER, Circuit Judge.

These interlocutory appeals arise out of the pretrial detention of defendant-appellant/defendant-appellee Peter Gotti at the Metropolitan Detention Center ("MDC") in Brooklyn, New York, shortly after he was arrested for allegedly engaging in various racketeering-related activities. In No. 02–1472, Gotti appeals from an order entered in the United States District Court for the Eastern District of New York (Block, *J.*) denying his motion to revoke a detention order entered by the Magistrate Judge that he be detained without bail pending trial, arguing that the offenses he was alleged to have committed in the grand jury's indictment were not "crimes of violence" as that term is defined in the Bail Reform Act of 1984, 18 U.S.C. § 3156(a)(4) ("BRA"). In No. 02–1521, the Government appeals from an order entered by Judge Block (1) declaring unconstitutional the mandatory administrative exhaustion requirement contained in the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), as applied to Gotti; and (2) granting Gotti's motion to be released from administrative confinement and returned to the general prison population, Judge Block having found that Gotti's administrative confinement was unconstitutional "punishment" of a pretrial detainee.

For the reasons set forth below, we affirm the District Court's order in No. 02–1472, and dismiss as moot the appeal in No. 02–1521.

## BACKGROUND

I. *No. 02–1472—Pretrial Detention Without Bail*

On June 4, 2002, Peter Gotti was arrested along with sixteen other alleged members and associates of the Gambino Organized Crime Family named in a sixty-eight-count RICO indictment. The RICO enterprise was alleged to be the Gambino Crime Family, of which Gotti was alleged to be the defacto leader. The gravamen of the indictment returned by the grand jury was that the Gambino family members were involved in racketeering schemes involving labor unions and businesses operating at piers and terminals in Brooklyn and Staten Island, New York. The predicate acts alleged were, among other things, extortion, illegal gambling, money laundering, wire fraud, and witness tampering. Examples of predicate acts alleged in the indictment include: (1) using extortion to influence the election of executive officers within the highest levels of the International Longshoremen's Association ("ILA") union; (2) using extortion as part of a bid-rigging/kickback scheme involving various lucrative service contracts for the ILA's national health plan; (3) extorting monies from various waterfront businesses, employees, and relatives of prospective waterfront employees; (4) operating two large-scale illegal gambling businesses; (5) using extortion to collect debts owed by a loan-shark victim; (6) illegally laundering the proceeds, said to be tribute payments to Gotti and others, from the extortions and illegal gambling businesses charged in the indictment; and (7) tampering with grand jury witness testimony.

The particular charges laid out in the indictment against Gotti were racketeering, in violation of 18 U.S.C. §§ 1961(1), and 1961(5); racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963; money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and

1956(a)(2). The indictment also contained allegations that the extortion and illegal gambling activities summarized above were the source of the proceeds used in the money laundering transactions in which Gotti allegedly participated. Finally, while Gotti was not charged with having committed the extortions alleged in the indictment, the Government nevertheless alleged that he was either the Acting Boss or the actual Boss of the Gambino Crime Family and that, in this capacity, he was aware of and directed and supervised the entire RICO enterprise and, specifically, the extortions charged in the indictment.

On the same day that Gotti was arrested, the Government requested that he be detained without bail pending trial on the ground that he posed a danger to the community. A hearing on the Government's request was held before Magistrate Judge Pollak. At that hearing, the Government presented the expert testimony of an FBI Special Agent about Gotti's role within the Gambino Crime Family and made a proffer, corroborated with surveillance photographs and tape recordings, to demonstrate the strength of its criminal case against Gotti. The case presented by the Government in support of its application that Gotti be detained without bail was as follows: Gotti became the leader of the Gambino Crime family following the criminal convictions of his brother, John Gotti, and of his nephew (the latter's son), John Gotti, Jr. In that capacity, Gotti represented the family at meetings attended by the leaders of other organized crime families and at weddings and funerals of various organized crime figures. Under Gotti's leadership, members of the Gambino Crime Family used threats of force and violence to place a Gambino associate on the ILA Executive Council and to ensure that a lucrative ILA contract was awarded to a company partly owned by a Gambino associate. Secret payments of the proceeds from the extortionate activities charged in the indictment were said to have been made to Gotti.

The Government contended that, as the leader of the Gambino Crime Family, Gotti directed the activities of his codefendants and therefore was responsible for the extortions and the other crimes allegedly committed by them. Accordingly, the Government argued that Gotti posed a significant risk of danger to the community. In response to the case presented by the Government, Gotti's counsel asserted that Gotti was not the boss of an organized crime family and was not guilty of the charges set forth in the indictment. Gotti attacked the credibility of the Government's evidence, questioned the inferences that the Government sought to draw from that evidence, and accused the Government of unfairly targeting Gotti based solely on the fact that he was the brother of the late John Gotti.

In a June 10, 2002 unpublished, thirteen-page decision and order, the Magistrate Judge ordered Gotti detained pending trial without bail based on "clear and convincing evidence" presented by the Government that "there [were] no conditions or combination of conditions that [would] reasonably assure the safety of the community [were] he to be released on bail." In particular, the Magistrate Judge found that Gotti had been "charged with a crime of violence" and therefore could "be detained on grounds of dangerousness" because it was "clear from the indictment that Peter Gotti [was] charged with being the Acting Boss of the Gambino [C]rime [F]amily, responsible for controlling the activities of the racketeering enterprise, and conspiring with the members of the organization to engage in the various acts charged in the indictment." These acts were said to include extortion, "which by its very nature is considered to be an act

of violence under the [BRA], in that threats of force and intimidation are used to collect monies and to force others to engage in acts in response to those threats."

Thus, according to the Magistrate Judge, while Gotti was not "named in the specific racketeering counts of extortion, he could nonetheless be held responsible for the acts of the members of his organization if the [G]overnment prove[d] that he [was] in fact the Acting Boss of the family." And the Magistrate Judge concluded that the Government had met its burden of proving that Gotti was in charge of the Gambino Crime Family by providing evidence of the type that this Court had found probative in other cases. The evidence presented in this case demonstrated that: (1) through statements of cooperating witnesses, Gotti held the leadership position; (2) Gotti met with members and associates of the Gambino family in a manner consistent with organized crime leadership; (3) there was a link between Gotti and the receipt of monies obtained through the collection of extortionate payments; (4) Gotti engaged in surreptitious attempts to contact the Gambino Crime Family's former boss, his incarcerated brother John Gotti; and (5) Gotti participated in meetings with, and served as arbiter of disputes between, other organized crime families.

Gotti subsequently filed a motion with the District Court requesting that the Magistrate Judge's detention order be revoked. As part of that motion, Gotti offered a bail package of approximately $4 million secured by properties of friends and associates, with conditions of home confinement and electronic monitoring. The District Court denied Gotti's motion in an unpublished August 7, 2002 decision and order for the reasons given in what it described as the Magistrate Judge's "thorough, well-reasoned decision." In particu-

lar, the District Court relied on the "testimony, transcripts, surveillance records and photographs" presented by the Government that "document[ed] Gotti's position as Acting Boss," of the criminal RICO enterprise charged and the fact that Gotti did "not seriously dispute that he [was] the Acting Boss of the Gambino family." The District Court also relied on precedents from this Court "uniformly" holding that "where the [G]overnment has demonstrated that a defendant is a leader of an organized crime family . . . the defendant is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release." On August 9, Gotti filed a timely interlocutory appeal from the District Court's order denying his motion to revoke the Magistrate Judge's detention order.

## II. *No. 1521—Pretrial Administrative Confinement*

On August 16, the Warden of MDC, acting on behalf of the Bureau of Prisons ("BOP"), removed Gotti from the general prison population at MDC and placed him in "administrative detention" in a special housing unit. The justification advanced by the BOP in late August/early September for Gotti's administrative detention was information received by the FBI some time before August 16, 2002 that Gotti had approved, and was participating in the planning of, a Gambino Crime Family plot to assassinate the prison warden in whose custody John Gotti, Sr. had been placed during the period preceding his death from cancer. The alleged motive for the assassination was that this warden had failed to provide John Gotti, Sr. with adequate medical care during his incarceration. The plotters supposedly believed that proper treatment would have prevented the death—or at least prolonged the life—of John Gotti, Sr. Based on the "seriousness

of the information and the possibility of imminent harm to the [targeted] Warden and his family, the FBI and the BOP [were] undertak[ing] a top-priority investigation into the murder plot." Shortly after August 20, representatives of the FBI met with Gotti and his counsel, informed him that the assassination plot was the justification for his administrative confinement and warned him that the plot should not be executed. Gotti denied knowing anything about an assassination plot.

Gotti has not sought a review of the BOP's actions through the BOP internal administrative procedures, nor apparently has one been provided. Instead, Gotti moved on September 2 in the District Court, pursuant to the BRA, for release from administrative confinement. He sought return to the general population on the ground that his administrative confinement was unconstitutional. On September 4, the Government filed a written opposition to Gotti's motion, arguing that (1) the District Court lacked jurisdiction because the mandatory administrative exhaustion requirement of the PLRA was applicable to the relief Gotti was requesting; and (2) even if exhaustion were not required, the relief Gotti was requesting should be denied on the merits. In particular, the Government argued that the purposes of Gotti's administrative confinement were "to limit [his] ability to facilitate the [assassination] plot by curtailing his access to other inmates in the general population who could assist him [in the plot] by passing messages" and to "enable the prison to more effectively monitor [his] communications." In support of its second argument, the Government referred to unspecified "credible information" recently obtained by the FBI. Gotti, of course, denied that there was any basis for his administrative confinement.

On September 5, the District Court heard argument on Gotti's motion. At that hearing, it was established that the BOP administrative review process could take at least fifty days. It therefore appeared that Gotti could remain in administrative confinement through the beginning of his expedited trial. The Government also offered little in response to concerns voiced by the District Court that pursuing the BOP administrative remedies would be futile because the Government would not disclose to Gotti the evidence supporting its belief that Gotti was involved in the assassination plot, leaving Gotti in a position of being able only to deny the allegation. When the Government equivocated on whether it would waive its PLRA exhaustion defense before an *in camera* hearing could be held so the District Court could test the credibility of the evidence underlying the Government's suspicion that Gotti was involved in the assassination plot, the District Court ruled that the PLRA's requirement for exhaustion of administrative remedies was unconstitutional as applied to Gotti. Having determined that the PLRA's exhaustion requirement was unconstitutional, the District Court then ordered the Government to appear at an *in camera* hearing to discuss the evidence justifying Gotti's administrative confinement.

At the *in camera* hearing, the District Court heard testimony from an FBI Special Agent concerning the source and specifics of the assassination allegations. Given that the transcript of that proceeding is sealed, we decline to disclose the contents of the Special Agent's testimony in this opinion. Suffice it to say that, by the end of the hearing, the District Court was more comfortable with the Government's justification for the administrative confinement of Gotti, which included the fact that this confinement was necessary to prevent the Government's investigation of the as-

sassination allegation from being compromised. Significantly, before putting on the testimony of the Special Agent, the Government asked for "an additional two weeks [i.e., until September 20]—to allow us to complete the investigative steps, so we can complete what we want to complete and assure ourselves that there will not be a material increase of the risk to the [targeted] Warden by returning Peter Gotti to the general population." Indeed, the Government assured the District Court that "within two weeks we feel, unless there is some material new development, we feel comfortable ensuring that he will [be] return[ed] to the general population." The District Court declined this request as being "unreasonable" and gave the Government until the close of business on September 10 to wrap up its investigation and provide a status report before it ruled on Gotti's motion.

The deadline specified by the District Court came and went without the status report due from the Government. The Government's request for an extension was denied. Consequently, on September 10, the District Court made its ruling granting Gotti's motion, ordering him released to the general prison population, and denying the Government's request for a stay pending appeal. The ruling was based on the District Court's finding that Gotti's continued administrative confinement was (1) punitive because it was not rationally related to the Government's stated purpose of keeping him there (i.e., minimizing the risk that the assassination plot would come to fruition) and (2) excessive in relation to that same purpose.

On September 11, the Government filed an interlocutory appeal with this Court as well as a motion for a stay of the District Court's order pending appeal. Accompanying the Government's stay motion was an affidavit executed by Michael Zenk, the Warden of MDC, and the individual who ordered that Gotti be placed in administrative detention. In his affidavit, Warden Zenk provided reasons justifying Gotti's administrative confinement in addition to those provided at the *in camera* hearing. Also provided in Warden Zenk's affidavit was the FBI's current view that "because the homicide plot had been exposed ... there would not be a material increase in the risk to the [targeted warden] and his family if Peter Gotti were released into the general population." This Court granted a temporary stay on the afternoon of September 11.

On September 17, a motions panel of this Court permanently granted the Government's motion to stay the District Court's order pending appeal and ordered expedited briefing so that the appeal could be argued on the same day as Gotti's appeal in Docket No. 02–1472.

## DISCUSSION

### I. *No. 02–1472—Pretrial Detention Without Bail*

The BRA provides that a court may order a defendant detained pending trial if he has been charged with a "crime of violence" and if the Government can show by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure ... the safety of the community." 18 U.S.C. § 3142(e), (f). The BRA defines a "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another," or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Id.* § 3156(a)(4)(A), (B). On appeal, Gotti argues that the Magistrate Judge and the District Court erred in (1)

**542**

concluding that he had been charged with a crime of violence; (2) adopting a per se rule that any defendant charged with being the head of an organized crime organization be detained prior to trial without bail; and (3) concluding that no conditions of his release were sufficient to ensure the safety of the community. For the reasons discussed below, we find no merit in any of these arguments.

 The flaw in Gotti's first argument is that, in determining whether he has been charged with a crime of violence, we should consider only the predicate acts ascribed to him in the indictment (i.e., money laundering) and not the objectives and means of the RICO enterprise as a whole, as alleged through the predicate acts ascribed to all enterprise participants. *See United States v. Winter,* 22 F.3d 15, 19 (1st Cir.1994) (in determining whether a RICO conspiracy is a crime of violence under the Federal Sentencing Guidelines, "the court must ask categorically oriented questions such as: 'Racketeering by what means?' Racketeering to what end?'").[1] Thus, Gotti need not be named in a predicate act charged in the indictment to be guilty of a racketeering conspiracy that includes that predicate act. As the Supreme Court explained in *Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), a conspirator charged with racketeering conspiracy need not commit or even agree to commit the predicate acts that are elements of a substantive count to be found guilty of the

racketeering conspiracy, for "it suffices that he adopt[ed] the goal of furthering or facilitating the criminal endeavor." *See also United States v. Chimurenga,* 760 F.2d 400, 404 (2d Cir.1985) (conspiracy to commit a crime of violence is a crime of violence for purposes of the BRA). Indeed, we made it quite clear in *United States v. Colombo,* 777 F.2d 96, 98 (2d Cir.1985), that the BRA "does not require that the defendant himself commit acts of physical violence as a condition precedent to a detention order." *See also United States v. Ferranti,* 66 F.3d 540, 543 (2d Cir.1995). Here, Gotti has been charged with engaging in a RICO conspiracy, the substantive basis for which was the RICO enterprise termed the Gambino Crime Family, which is alleged in the indictment to be an organization whose purposes include committing extortion. Certainly, it cannot be gainsaid that extortion is a "crime of violence" as that term is defined by the BRA. *See* 18 U.S.C. § 1951(b)(2) ("extortion" means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear....").[2] Both the Magistrate Judge and the District Court properly found that Gotti has been charged with a crime of violence.

██ Gotti's second argument, that the District Court erred in detaining him based solely on his alleged status as the leader of the Gambino Crime Family, rather than an individualized determination that no bail conditions could ensure the

---

1. *See also United States v. Doe,* 49 F.3d 859, 866 (2d Cir.1995) ("[T]he nature of the [RICO] conspiracy's substantive objective may provide an indication as to whether the conspiracy creates the substantial risk that physical force against the person or property of another may be used in the offense.").

2. Because we hold that Gotti was charged with having committed a crime of violence

based on the nature of the offenses charged in the indictment, we need not decide the question left open in *United States v. Dillard,* 214 F.3d 88, 92 (2d Cir.2000), whether the BRA's "crime of violence" requirement can be "satisfied when the risk of force results from the conduct or nature of the defendant rather than from the nature of the offense."

community's safety, is also unpersuasive. In support of this argument, Gotti points to the District Court's interpretations of the "spate of Second Circuit authority" cited in its decision "as being the pragmatic equivalent of a *per se* rule that where the [G]overnment established that a defendant is the leader or acting leader of an organized crime family, [he] must be detained." Read in the context of the District Court's and Magistrate Judge's decisions, the quoted language can only be read as gratuitous dicta. Indeed, as discussed above, the Magistrate Judge carefully reviewed and detailed both the quality and quantity of the evidence proffered by the Government and Gotti's attempt at rebutting it. Based on this review of the evidence, the Magistrate Judge concluded that the Government had met its burden of proving by clear and convincing evidence that Gotti was the head of the Gambino Crime Family. And, based on his activities as well as the activities of those he supervised and controlled, she concluded that there were no conditions or combination of conditions that would adequately and reasonably ensure the safety of the community. The Magistrate Judge's decision makes no mention of a per se rule concerning purported Mafia family crime bosses, and (as noted above) the District Court sustained her detention order based on her "thorough, well-reasoned decision." Our review of the record finds no "clear error" committed by either the Magistrate Judge or the District Court in reaching this conclusion. *See Ferranti,* 66 F.3d at 542.

In any event, to the extent that the District Court's characterization of our pretrial detention precedents as creating a per se rule with respect to people in Gotti's alleged position was not gratuitous dicta, we decline to embrace it. Each of our precedents relied on by the Magistrate Judge and the District Court in ordering that Gotti be detained pending trial without bail included a fact-intensive analysis of the quality and quantity of the evidence produced at the bail hearing in determining the defendant's role in the violent RICO enterprise alleged, and whether the acts committed by the enterprise, combined with his leadership role within the enterprise, justified pretrial detention. *See id.* at 543–44; *United States v. Orena,* 986 F.2d 628, 631–32 (2d Cir.1993); *Colombo,* 777 F.2d at 99–100; *see also United States v. Defede,* 7 F.Supp.2d 390, 392–95 (S.D.N.Y.1998).

■ Finally, Gotti's third argument, that the District Court erred in finding no conditions of release sufficient to ensure the safety of the community short of pretrial detention, must also be rejected. Here, too, we find no clear error in the District Court's conclusion, *see Ferranti,* 66 F.3d at 542, as this Court has rejected as insufficient various conditions of release proposed in cases involving the pretrial detention of purported leaders of organized crime families shown to be involved in violent criminal activities. *See id.* at 543–44 (rejecting $1 million bail secured by real property); *Orena,* 986 F.2d at 630, 632–33 (rejecting $1 million bail secured with real property, in-home detention, restricted visitation and telephone calls, and electronic monitoring); *Colombo,* 777 F.2d at 97, 100 (rejecting $500,000 bail secured with real property). Accordingly, we affirm the order of the District Court in No. 02–1472 that Gotti be detained pending trial.

## II. *No. 02–1521—Pretrial Administrative Confinement*

■ In ordering that Gotti be released from administrative detention back into the general prison population, the District Court: (1) declared the mandatory admin-

istrative exhaustion requirement of the PLRA unconstitutional as applied to Gotti's administrative confinement; (2) found that requiring any administrative exhaustion would be futile; and (3) found Gotti's administrative confinement to be unconstitutional punishment of a pretrial detainee. On November 12, 2002, we were notified by the Government that the BOP had released Gotti from administrative confinement and returned him to the general prison population of MDC. Consequently, it would be "impossible" for us to grant "any effectual relief whatever to" the Government were it to prevail in this appeal. *See In re Kurtzman,* 194 F.3d 54, 58–59 (2d Cir.1999) (per curiam). Moreover, the issues raised in the Government's appeal, although "capable of repetition," cannot be characterized as "evading review." *Id.* Accordingly, the Government's appeal in No. 02–1521 is dismissed as moot. *See id.* Furthermore, the stay we granted of the District Court's order pending that appeal is also vacated as moot. *Cf. Glover v. McMurray,* 507 F.2d 1325, 1326 n. 3 (2d Cir.1974) (per curiam).

## CONCLUSION

The order of the District Court in No. 02–1472 is affirmed. The appeal in No. 02–1521 is dismissed as moot.