UNITED STATES of America,

v.

David PIRK, Defendant.

1:15–CR–00142 EAW

United States District Court,
W.D. New York.

Signed December 12, 2016

Brendan T. Cullinane, Joseph M. Tripi, Caleb J. Petzoldt, U.S. Attorney's Office, Buffalo, NY, for United States of America.

Cheryl Meyers Buth, Murphy Meyers LLP, Orchard Park, NY, William T. Easton, Rochester, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District Judge

## I. BACKGROUND

Defendant David Pirk (hereinafter "Defendant" or "Mr. Pirk") seeks revocation of the magistrate judge's detention order pursuant to 18 U.S.C. § 3145(b). (Dkt. 348). Defendant is one of 16 defendants named in a 46–count Second Superseding Indictment (Dkt. 33) returned on March 16, 2016, that alleges various crimes, including a RICO[1] conspiracy in violation of 18 U.S.C. § 1962(d), firearm offenses in violation of 18 U.S.C. § 924, and various VICAR[2] counts, pertaining to the operation of the Kingsmen Motorcycle Club ("KMC").

The Second Superseding Indictment paints a picture of a biker club obsessed with maintaining its perceived power and preventing members from "jumping patch" to rival clubs through the use of force and violence, ultimately escalating to the murders of two allegedly disloyal members. According to the Second Superseding Indictment, the organization operated through a strict hierarchal structure, with orders coming from the top down, and Defendant was at the very top—serving as the national president of KMC. (Dkt. 33 at ¶¶ 5–6).

Defendant is named in the following eight counts:

(1) Count 1 (RICO conspiracy) in violation of 18 U.S.C. § 1962(d);

(2) Count 2 (possession of firearms in furtherance of crime of violence) in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2;

(3) Count 19 (murder in aid of racketeering) in violation of VICAR, 18 U.S.C. §§ 1959(a)(1) and 2;

(4) Count 20 (murder in aid of racketeering) in violation of VICAR, 18 U.S.C. §§ 1959(a)(1) and 2;

(5) Count 21 (possession and discharge of firearm in furtherance of crime of violence) in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j), and 2;

(6) Count 22 (possession and discharge of firearm in furtherance of crime of violence) in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j), and 2;

---

1. "RICO" refers to the Racketeer Influenced and Corrupt Organizations Act, codified at 18 U.S.C. §§ 1961–1968.

2. "VICAR" refers to the Violent Crimes in Aid of Racketeering statute, codified at 18 U.S.C. § 1959.

(7) Count 45 (using and maintaining the KMC South Buffalo Chapter's clubhouse for drug dealing) in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2; and

(8) Count 46 (possession of firearms in furtherance of drug trafficking) in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.

(Dkt. 33). Initially, a Notice of Special Findings was filed with respect to Mr. Pirk on Counts 19 through 22, which arguably subjected him (along with co-defendant Andre Jenkins ("Jenkins")) to the death penalty. (*Id.* at 70–71). However, the United States Attorney General authorized and directed the U.S. Attorney's Office in this district not to seek the death penalty with respect to Mr. Pirk (or Jenkins). (Dkt. 348–2).

Defendant was arrested and subsequently arraigned on March 22, 2016, in the United States District Court for the Middle District of Florida, Ocala Division, where he was temporarily detained by United States Magistrate Judge Philip R. Lammens pending a detention hearing scheduled for the following day. (Dkt. 364 at 2). The United States Probation Office in that district prepared a Pretrial Services Report, recommending that Mr. Pirk be released on conditions. (Dkt. 349 at 2–9) (filed under seal).

On March 23, 2016, a detention hearing was held before Magistrate Judge Lammens, who considered Defendant's detention at the same time he considered the detention of a co-defendant, Timothy Enix (hereinafter "Enix"). The hearing before Magistrate Judge Lammens lasted approximately two hours. (Dkt. 364 at 2 n.1). The Government proceeded by proffer and also presented the testimony of FBI Special Agent David Brown. (Dkt. 348–3) (transcript of detention hearing before Magistrate Judge Lammens). Patty K. Wayland, Defendant's significant other, testified on his behalf at the hearing. (*Id.* ). At the conclusion of the hearing, Defendant was ordered detained, as was Enix.[3] (*Id.* at 52–55).

On May 4, 2016, Defendant filed a motion requesting that United States Magistrate Judge Michael J. Roemer, the magistrate judge assigned to the case in this district, conduct a *de novo* review of Magistrate Judge Lammens' decision. (Dkt. 129). On May 23, 2016, Magistrate Judge Roemer determined that he did not have authority to review the detention decision of another magistrate judge. (Dkt. 153; *see* Dkt. 364 at 4).

On October 27, 2016, Defendant filed a motion before the undersigned seeking revocation of Magistrate Judge Lammens' detention order. (Dkt. 348). The Government filed its response in opposition on November 21, 2016. (Dkt. 364). Defendant filed a supplement to his motion on November 29, 2016. (Dkt. 371). A motion hearing was held on December 1, 2016, at which both counsel for the Government and Defendant proceeded by proffer. (Dkt. 373). At the completion of the motion hearing, the Court reserved decision.

## II. LEGAL STANDARD

■ The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, authorizes and sets forth the procedures for the release or detention of a person pending trial, sentence, and appeal. The procedures and standards for release or detention of a person pending trial are set forth at 18 U.S.C. § 3142. A defendant awaiting trial must be released unless the release will present a risk of flight or danger, or both,

---

**3.** On July 21, 2016, the undersigned granted Enix's motion to revoke Magistrate Judge Lammens' detention order, and he was released on conditions. (Dkt. 224).

and no set of conditions can reasonably protect against those risks. *See United States v. Berrios–Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (explaining that the Bail Reform Act codified "traditional presumption favoring pretrial release for the majority of Federal defendants" (quotation omitted)).

■ Although there is "only a limited group of offenders who should be denied bail pending trial," *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (citations and quotations omitted), when there is a "a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate," *United States v. Chimurenga*, 760 F.2d 400, 403 (2d Cir. 1985) (quotations omitted).

■ In this case, due to the nature of the charges against Defendant, there is a rebuttable presumption pursuant to 18 U.S.C. § 3142(e)(3) that no condition or combination of conditions will reasonably assure the appearance of Defendant and the safety of the community if Defendant is released. *See United States v. Contreras*, 776 F.2d 51, 54–55 (2d Cir. 1985) (holding that a grand jury indictment establishes probable cause for purposes of the rebuttable presumption under the Bail Reform Act, and when faced with an indictment, the Court does not need to make an independent finding of probable cause). The presumption shifts to Defendant "a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "[A] defendant must introduce some evidence contrary to the presumed fact[s] in order to rebut the presumption." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir.

1991). If a defendant satisfies this burden of production and rebuts the presumption, it does not disappear; rather, the presumption "remains a factor to be considered among those weighed by the district court." *Mercedes*, 254 F.3d at 436.

■ Even in a presumption case, however, at all times the Government retains the ultimate burden of persuasion. The burden of proof with respect to risk of flight is preponderance of the evidence. *Id.* On the other hand, the Government must demonstrate by clear and convincing evidence that a defendant should not be released due to his risk of danger. *Chimurenga*, 760 F.2d at 405. Clear and convincing evidence "means something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'" *Id.* In other words, the evidence must support a conclusion of danger to the community "with a high degree of certainty." *Id.*

The statutory factors that a court must consider in deciding whether a defendant has rebutted the presumption of flight and danger, and whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, are as follows:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, ... or involves ... a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the com-

406

munity, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g); *see also Mercedes*, 254 F.3d at 436 ("To determine whether the presumptions of dangerousness and flight are rebutted, the district court considers ... [the factors set forth at] § 3142(g).").

■ In reviewing a detention order of a magistrate judge, a district judge should not simply defer to the judgment of the magistrate judge, but rather must reach her own independent conclusions. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). "When making its *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence." *United States v. Marra*, 165 F.Supp.2d 478, 481 (W.D.N.Y. 2001).[4]

### III. ANALYSIS

■ Based upon its review of the record and the factors set forth in § 3142(g),

including consideration of the rebuttable presumption of flight and danger, the Court concludes that the Government has established by a preponderance of the evidence that Defendant presents a flight risk, but there may be conditions that would reasonably protect against that risk. However, because the Government has established by clear and convincing evidence that Defendant's release would endanger the safety of any other person and the community, and no condition or combination of conditions will reasonably protect against those risks, Defendant's motion to revoke the magistrate judge's detention order (Dkt. 348) is denied.

### A. NATURE AND CIRCUMSTANCES OF THE OFFENSES CHARGED

Defendant is charged in eight separate counts with very serious crimes, including a RICO conspiracy allegedly involving a pattern of racketeering activity with predicate acts of murder, robbery, kidnapping, drug trafficking, and obstruction of justice, and two separate VICAR counts purportedly involving an execution-style murder of two individuals that occurred on September 6, 2014, outside the KMC North Tonawanda Chapter clubhouse. Defendant is also charged with four firearm offenses in violation of § 924.

Defendant is alleged to have served in the role of national president of KMC, an alleged one-percent motorcycle club [5]

4. Defendant's motion specifically requested relief in the form of a *de novo* detention hearing (Dkt. 348 at 1). As the Court indicated at the motion hearing on December 1, 2016, Defendant was entitled to such a hearing before this Court, so to the extent that Defendant moved for a *de novo* detention hearing, that aspect of his motion was granted.

5. A one-percent motorcycle club is one that is not law abiding; the term is "derived from an American Motorcycle Association official's remark in the 1950s that 99 percent of all bikers were law-abiding, and thus 'only' one percent of the motorcycles on the roads belonged to persons who were trouble-makers." *Piscottano v. Murphy*, 511 F.3d 247, 255 (2d Cir. 2007). (*See* Dkt. 33 at ¶ 23).

aimed at engaging in criminal activity that allegedly preserved and protected its power through intimidation, violence, threats of violence, assaults, murder and attempted murder. According to the Government's proffer, KMC operated pursuant to a strict chain-of-command, and Defendant was the leader of the organization for a significant portion of the acts alleged in the Second Superseding Indictment—from murder, to attempted murder, to illegal drug distribution, to prostitution.

Defendant is specifically referenced in the following overt acts alleged as part of the RICO conspiracy:

■ In or about March 2013, during the course of "Bike Week" in Daytona, Florida, defendants DAVID PIRK and EDGAR DEKAY, II, and other KMC members discussed the KMC becoming a 1% biker club (Dkt. 33 at ¶ 11);

■ In or about 2013, the KMC members affiliated with defendant, DAVID PIRK began eliminating non-compliant members remaining loyal to a former KMC National President (*id.* at ¶ 12);

■ In or about January 2014, defendant FILIP CARUSO and another KMC member traveled from New York to Florida on orders of defendant DAVID PIRK to assist in recovering KMC colors from a KMC Chapter in Hernando Valley, Florida who "jumped patch" from the KMC to the Pagans, a rival 1% motorcycle club (*id.* at ¶ 31);

■ In or about January 2014, defendants FILIP CARUSO and ANDRE JENKINS, while armed with firearms, travelled to a KMC Clubhouse in Leesburg, Florida, met with KMC National President defendant DAVID PIRK, KMC Florida/Tennessee Regional President defendant TIMOTHY ENIX, and others, and agreed that they would get their KMC colors back from the Pagans by any means

necessary, including murdering Pagans and kidnapping Pagan Old Ladies (*id.* at ¶ 33);

■ On or about February 24, 2014, defendant FILIP CARUSO, and others shut down the KMC Attica Chapter clubhouse on defendant DAVID PIRK's orders (*id.* at ¶ 34);

■ On or about August 3, 2014, KMC members from the Northern Region of New York, including defendants FILIP CARUSO, ED DEKAY, JASON WILLIAMS and GLEN STACHARCZYK, and Paul Maue and others, obtained firearms from the KMC North Tonawanda Chapter clubhouse and went to the KMC South Buffalo Chapter clubhouse to confront defendant DAVID PIRK about KMC rule changes. During the confrontation, defendant FILIP CARUSO possessed a Kel–Tec firearm in his waistband, and several armed KMC members, who were in town from Florida, arrived to support defendant DAVID PIRK during the confrontation (*id.* at ¶ 37);

■ On or about August 3, 2014, after the confrontation at the KMC South Buffalo Chapter clubhouse, KMC members from the Northern Region of New York, including defendant FILIP CARUSO and Paul Maue and other KMC members, had a meeting with defendant DAVID PIRK inside the South Buffalo Chapter clubhouse (*id.* at ¶ 38);

■ Between September 1, 2014, and September 2, 2014, defendants ANDRE JENKINS and DAVID PIRK communicated via cellular telephone (*id.* at ¶¶ 41–42); and on September 2, 2014, DAVID PIRK communicated via cellular telephone with a KMC member of the Olean Chapter (*id.* at ¶ 43);

■ On or about September 3, 2014, defendants ANDRE JENKINS and DAVID PIRK, and another KMC

member, known by the nickname "Drifter," arrived in Olean, New York at the Olean Chapter clubhouse (*id.* at ¶ 46);

■ On or about September 3, 2014, KMC Olean Chapter President defendant ROBERT OSBORNE, JR. and defendants DAVID PIRK and ANDRE JENKINS, and another KMC member, had a closed door meeting inside the Olean Chapter clubhouse (*id.* at ¶ 47);

■ On or about September 5, 2014, after leaving a bar in North Tonawanda attended by several members of the Nickel City Nomads, defendant ANDRE JENKINS and a person known to the grand jury met with defendant DAVID PIRK and another KMC member traveling with him (*id.* at ¶ 54);

■ Sometime on or about and between September 4, 2014, and September 6, 2014, defendant DAVID PIRK told defendant ANDRE JENKINS to "take care of it" in reference to killing Paul Maue and Daniel "DJ" Szymanski (*id.* at ¶ 57);

■ On or about September 6, 2014, at approximately 2:42 a.m., defendant DAVID PIRK called Paul Maue via cellular telephone after which Paul Maue and Daniel "DJ" Szymanski exited the KMC North Tonawanda Chapter clubhouse located at 322 Oliver Street, North Tonawanda, New York (*id.* at ¶ 58);

■ At some point following the murders of Paul Maue and Daniel "DJ" Szymanski on September 6, 2014, Olean Chapter President defendant ROBERT OSBORNE, JR. ordered the clubhouse video deleted to destroy evidence that defendant ANDRE JENKINS and defendant DAVID PIRK were in the Olean clubhouse (*id.* at ¶ 62);

■ At various times between September 5, 2014, and August 29, 2015, defendant THOMAS SCANLON used a cellular telephone to communicate with defendant DAVID PIRIC (*id.* at ¶ 64);

■ On or about September 6, 2014, defendant THOMAS SCANLON met with defendant DAVID PIRK (*id.* at ¶ 65);

■ On September 26, 2014, at 8:06 p.m., defendant ANDRE JENKINS called defendant DAVID PIRK via cellular telephone (*id.* at ¶ 66);

■ Beginning on a date unknown, but starting no later than the year 2006, and continuing to the date of the return of the Second Superseding Indictment, ALL defendants maintained the premises known as the KMC South Buffalo Chapter clubhouse located at 846/850 East Eagle Street, Buffalo, New York, to use, maintain, and distribute controlled substances, including cocaine and marijuana (*id.* at ¶ 87).

For each of the counts except for Count 45, Defendant is facing a potential penalty of life in prison. If convicted of either of the VICAR counts, Defendant faces a mandatory prison sentence of life, and each of the § 924(c) counts carries a mandatory minimum sentence ranging from 5 to 25 years to be served consecutively to any other sentence imposed.

In other words, Defendant is charged with some very serious and dangerous crimes, the most significant of which involves the execution-style murders occurring on September 6, 2014. The Court finds that the nature and circumstances of the offenses charged—the first factor under § 3142(g)—weighs strongly in favor of a finding that Defendant has not rebutted the presumptions of flight and danger, and he should be detained.

**B. WEIGHT OF THE EVIDENCE**

The evidence proffered by the Government against Defendant appears significant, as outlined both in its written sub-

mission and information presented during the motion hearing. The Government proffered evidence concerning Defendant's control over the KMC, and his direction of violent activity in his role as national president. The most serious conduct that Defendant is alleged to have directed involves the execution-style murders on September 6, 2014. The Government's evidence about Mr. Pirk's involvement in orchestrating those murders—while circumstantial in nature—appears to be substantial. The evidence is comprised of witnesses and informants, as well as documentary evidence such as cell phone records that place Defendant with Jenkins during the hours and days leading up to the murders.

The Government's proffer suggests that Defendant and Jenkins (who has been convicted of the murders in state court) coordinated their travel to the Buffalo area in the days prior to the murders; they maintained significant contact during their time in the Buffalo area and were together between 12:30 and 1:00 PM on the day of the murders after staying together on property possibly belonging to a member of Defendant's family; Jenkins was attempting to infiltrate a rival motorcycle club but his "cover" was apparently blown and he blamed it on alleged disloyalty of Paul Maue ("Maue") and Daniel "DJ" Szymanski ("Szymanski"); Defendant told Jenkins to "take care of it" upon learning this information; at 2:42 AM on September 6, 2014, Defendant called Maue who was in the KMC North Tonawanda Chapter clubhouse with Szymanski; that call lasted 4 minutes and 41 seconds (until about 2:47 AM); Maue and Szymanski left the clubhouse and got into the front seats of Maue's car; at approximately 2:50 AM, Jenkins shot and killed them from behind; a witness observed Jenkins riding away on a motorcycle while yelling "LKDK" or "Live a Kingsmen, Die a Kingsmen."

Even though he had allegedly just shot two KMC members, Jenkins was able to seek refuge after the murders at the KMC clubhouse in Olean, New York, and in Tennessee. Upon arriving in Tennessee, KMC members were initially inclined to retaliate against Jenkins, but Jenkins persuaded them to call Defendant, who told the Tennessee KMC members to "stand down."

The Government additionally proffered other evidence of eyewitness statements supporting the conclusion that Defendant instructed Jenkins to commit the murders. In addition, the Government proffered evidence of statements allegedly made by Defendant suggesting his involvement in the murders. Moreover, the Government proffered evidence that Defendant was constantly in possession of a firearm or firearms, even during his travels to New York, and on May 12, 2016, a search warrant executed at Defendant's residence in Florida resulted in the seizure of approximately fifteen firearms with ammunition and accessories. (*See* Dkt. 364–6).

Second Circuit case law supports the principle that danger may be established by clear and convincing evidence when a defendant has not personally participated in any violent acts, but where that defendant plays a leadership role in a criminal enterprise engaged in violent acts at the direction of the defendant. *See, e.g., United States v. Ciccone*, 312 F.3d 535 (2d Cir. 2002) (affirming detention order of a defendant who was the *de facto* leader of the Gambino Crime Family where evidence proffered suggested the defendant directed violent activities of the organization); *United States v. Orena*, 986 F.2d 628 (2d Cir. 1993) (district court erred in setting bail for defendants who were indicted as playing leadership roles in the Colombo Family of La Cosa Nostra, where the predicate acts included conspiring to commit murder, murder, and illegal possession

of weapons); *United States v. Colombo*, 777 F.2d 96 (2d Cir. 1985) (although the defendant did not directly participate in any of the crimes alleged, he was the leader of the criminal enterprise that carried out criminal activities at his direction, and therefore district court erred in ordering his release); *cf. United States v. Persico*, 376 Fed.Appx. 155, 157 (2d Cir. 2010) (reversing and remanding where the district court improperly applied the rebuttable presumption to support the defendant's detention, and recognizing that on remand, the issue of whether the defendant should be detained was a close case "given that [defendant] has no criminal record, that the government offers no direct evidence of [defendant] either using violence or directing others to use violence, and that the evidence suggests that [defendant] used any influence he had in order to discourage violence. . . .").

Of course, Mr. Pirk is presumed innocent and the Court's function here is not to determine guilt or innocence. *United States v. Jones*, 566 F.Supp.2d 288, 292 (S.D.N.Y. 2008). However, when weighing the evidence as required by § 3142(g)(2) to assess the danger and flight risk posed by Defendant's potential release, this Court is left with the inescapable conclusion that the weight of the evidence favors detention. Not only has the Government proffered evidence that Mr. Pirk was the leader of a criminal organization and directed that criminal activity, but it has proffered significant evidence of Mr. Pirk's direct involvement with the execution-style murders that occurred on September 6, 2014.

## C. HISTORY AND CHARACTERISTICS

Mr. Pirk is 66 years old. (Dkt. 348–1 at 13). He graduated from West Seneca East High School nearly 50 years ago, and he has had steady employment in the con-struction and manufacturing areas. (*Id*). Once Mr. Pirk moved from the Buffalo area to Florida, he was employed as a foreman at RT White construction for nine years, from 1994 through 2005, and then he formed and operated his own tree-trimming company in Eustis Florida, before retiring in 2012. (*Id.* at 13–14). He has two children from his first marriage, who both reside in the Erie/Niagara County area with their own families, and who, by all accounts, remain incredibly supportive of their father. (*Id.* at 14). Mr. Pirk's two children have agreed to post all of the property that they own, including their homes, to secure a bond for their father's release. (*Id.* at 14–15).

For the past 15 years, Mr. Pirk has resided with Ms. Wayland at a modest mobile home dwelling in Eustis, Florida. (*Id.* at 15). Both Mr. Pirk and Ms. Wayland are also willing to post all of the property they own to secure a bond, as is Ms. Wayland's sister and a family friend. (*Id.*).

Mr. Pirk has deep ties to the Eustis, Florida, community, as reflected by the significant letters submitted on his behalf. (Dkt. 348–8; Dkt. 371). He does not possess a passport, and his last international travel was on a cruise to Mexico approximately seven years ago. (Dkt. 349 at 4). He is under a physician's care for medical conditions as documented in the Pretrial Services Report, and he allegedly does not consume alcohol or use illegal drugs. (*Id.* at 5). Mr. Pirk's assets are fairly limited, as documented in the Pretrial Services Report (*id.*), and indeed, he has qualified for assigned counsel in this case.

Mr. Pirk does have a criminal history, that was characterized by this district's Probation department as "rather extensive" (Dkt. 349 at 2), but this Court disagrees with that characterization. The dispositions of the various arrests docu-

mented in the Pretrial Services Report are unknown in many instances (*id.* at 5–7), likely due to their age, and Defendant at least represents that he has a misdemeanor conviction from 1976 in North Tonawanda City Court and a reckless driving conviction in Florida from 1992, neither of which would result in any criminal history points under the Sentencing Guidelines. (Dkt. 348–1 at 13).

Consideration of this factor under § 3142(g), in the Court's view, supports Defendant's request for the setting of reasonable bail.

### D. NATURE OF DANGER

The Government has proffered evidence that one of the purposes of KMC was to instill fear in those who were disloyal. This evidence includes alleged targeting and intimidating witnesses, as well as murder and attempted murder.

Defendant argues that the substantial bail package offered on his behalf could protect against any risk of flight or danger. Defendant has offered real property valued at approximately $454,000 to secure his release. (Dkt. 348–1 at 17–18). In addition, during the motion hearing, defense counsel represented that audio recordings of telephone calls by Mr. Pirk from jail have been turned over by the Government, and they do not contain any alleged threatening or violent statements.

Notwithstanding the rebuttable presumptions in this case, the Court does believe that conditions could be set that would adequately protect against Defendant's risk of flight. These conditions would entail very strict conditions, and involve a substantial financial package. However, the Court does not believe that any conditions could protect the community and others from the danger presented by Defendant's release.

Put simply, the evidence proffered by the Government suggests that Defendant was intimately involved in the execution-style murders on September 6, 2014, and that in his leadership role with KMC, he had and would continue to have the ability to threaten, intimidate, and harm individuals who were disloyal to the organization. The Court is faced with evidence that Jenkins, who was convicted of the murders in state court, had significant contact with Defendant in the hours and days leading up to the murders, and perhaps most incriminating—at the time of the murders, Maue was talking by phone to Defendant. Given the significant penalties that Defendant is facing, this Court has real concerns that, if released, nothing would impede Defendant from attempting to frustrate this prosecution through criminal activity. According to the Second Superseding Indictment in this case, that has already happened. The risk posed by Defendant's potential release is simply unacceptable. The Government has established by clear and convincing evidence that Defendant's release would endanger the community and others, and no conditions could reasonably protect against that risk.

It cannot be stressed enough that Defendant is presumed innocent, and this Court will do everything in its power to ensure that Defendant is afforded all of the constitutional protections to which he is entitled throughout the prosecution of this matter. However, based upon the factors set forth in § 3142(g), and the record presented to this Court, there are no conditions that could be put in place to reasonably protect against the risk of danger that would be presented by Defendant's release from custody. Accordingly, Defendant's motion to revoke the magistrate judge's detention order is denied.

### CONCLUSION

For the foregoing reasons, Defendant's motion to revoke the magistrate judge's

detention order (Dkt. 348) is denied.[6]

SO ORDERED.

---

6. As part of his motion, Defendant also sought from this Court an order, pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that the Government produce any evidence in its possession that the KMC board of directors rejected becoming a one percent club in 2013–2015. (Dkt. 348 at 2). This Court agrees with the Government (Dkt. 364 at 36–41) that any such information would be better known by Defendant, as opposed to the Government, and therefore it does not appear to be within the scope of *Brady*. *See United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) ("Evidence is not 'suppressed' if the defendant either knew, . . . or should have known, . . . of the essential facts permitting him to take advantage of any exculpatory evidence."). In any event, this Court declines to issue any such order, at least at this time, for the reasons articulated in its Decision and Order filed on October 3, 2016. (Dkt. 327).